## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ANNETTE MARIE REICHLING,** | : | |
| | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:12-CV-1069** |
| | : | |
| **v.** | : | **(MARIANI, J.)** |
| | : | **(SCHWAB, M.J.)** |
| **CAROLYN W. COLVIN,**[1] | : | |
| | : | |
| **Defendant** | : | |

## <u>REPORT AND RECOMMENDATION</u>

## I.    INTRODUCTION

The Plaintiff, Annette Marie Reichling, pursues this claim for social security benefits against the backdrop of a voluminous administrative record comprised of more than 1,100 pages, including medical opinions by more than 16 different sources.  In this case, the court is called upon to decide whether the administrative law judge (ALJ) properly evaluated the medical evidence of record in the fourth decision denying the Plaintiff's eighteen-year-old applications for benefits under Title II and Title XVI of the social security act, 42 U.S.C. §§ 401 *et seq.*, and 1381 *et. seq.* (the Act).  After thorough review, I find that the ALJ's decision lacks

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue as the Defendant in this suit.  No further action need to be taken to continue this suit pursuant to 42 U.S.C. § 405(g).

sufficient explanation to permit judicial review and recommend that the decision of the Commissioner be vacated and the case remanded for additional proceedings based on the reasons stated herein.

The Plaintiff appeals from an adverse decision denying her Title II and Title XVI applications for disability insurance benefits (DIB) and supplemental security income (SSI) under the Act.[2]  The Plaintiff alleges that she became disabled on August 18, 1996, due to: degenerative disc disease of the lumbar spine, right knee internal derangement with status post arthroscopic surgery, obesity, diabetes, asthma, hypertension, irritable bowel syndrome, varicose veins, and gastritis, in addition to an alleged mental impairment.

After her applications were denied, initially and on reconsideration, the Plaintiff requested an administrative hearing.  *Tr.* 168-84.[3]  On August 31, 1998,

---

[2] The Plaintiff's applications for benefits were not included in the administrative record.  Furthermore, there appears to be some uncertainty as to when these applications were filed.  In ALJ Confresi's decision dated October 28, 1999, he noted that both applications were filed on November 6, 1996.  *Tr.* 12.  In ALJ Strauss' decision dated August 4, 2008, she noted that both applications were filed on March 19, 1997.  *Tr.* 599.  Finally, in ALJ Strauss' decision dated February 3, 2010, she noted that the Plaintiff's Title XVI application was filed on November 6, 1996, and the Title II application was filed on October 9, 1997.  *Tr.*  527.

[3] "*Tr.*" Refers to the transcript from the Social Security Administration and appears as Document 7 and its attachments, and Document 10 on the ECF docket report. The pinpoint citations to the transcript refer to the Bates-stamped number in the top right-hand corner of each page.

the Plaintiff appeared and testified at an administrative hearing before ALJ Manuel

Confresi in Queens, New York; the hearing was continued until March 30, 1999, to

obtain additional medical evidence. *Tr.* 140-64. On March 30, 1999, the Plaintiff

appeared and testified at a supplemental administrative hearing before ALJ

Confresi in Queens, New York. *Tr.* 95-139. A medical expert in the field of

psychiatry also appeared and testified at the first supplemental hearing. *Tr.* 129-

139. The proceedings were continued, for a second time, until August 30, 1999, to

appoint an additional medical expert in the field of orthopedics. *Id.* On August 30,

1999, the Plaintiff appeared and testified at a second supplemental administrative

hearing before ALJ Confresi in Queens, New York. *Tr.* 45-94. A medical expert

in the field of orthopedics also appeared and testified at the second supplemental

hearing. *Tr.* 72-94. The Plaintiff's applications for benefits were denied following

the second supplemental hearing in a written decision dated October 28, 1999. *Tr.*

12-24. On November 16, 1999, the Plaintiff sought, and was denied, review by the

Appeals Council. *Tr.* 8-11. Thereafter, on January 8, 2003, the Plaintiff

commenced an action in the United States District Court for the Eastern District of

New York. On September 5, 2003, the parties executed an agreement and

stipulated that the case should be remanded pursuant to the fourth sentence of 42

U.S.C. § 405(g); the court issued an order remanding this case on the same day.

3

On October 4, 2005, the Plaintiff appeared and testified at a second ALJ hearing before ALJ Confresi.  *Tr.* 1165-1193.  The Plaintiff's applications for benefits were denied for a second time in a written decision dated March 15, 2006. *Tr.* 584-94.  The Plaintiff sought, and was granted, review by the Appeals Council. *Tr.* 562- 64.  On June 17, 2006, the Appeals Council remanded this case for further proceedings before a second ALJ.  *Id.*

On April 8, 2008, the Plaintiff appeared and testified at a third administrative hearing before ALJ Hazel Strauss in Jamaica Queens, New York; the hearing was continued until May 13, 2008.  *Tr.* 1096-1164.  On May 13, 2008, the Plaintiff appeared and testified at a supplemental hearing before ALJ Strauss. *Tr.* 1030-95.   An impartial vocational expert (VE) also testified at this supplemental hearing.  *Tr.* 1047-1095. The Plaintiff's applications for benefits were denied a third time in a written decision dated August 4, 2008.  *Tr.* 598-613. The Plaintiff sought, and was granted, review by the Appeals Council.  *Tr.* 658-65, 685-87.  On June 17, 2006, the Appeals Council remanded this case for further proceedings.  *Id.*

On January 5, 2010, the Plaintiff appeared and testified at a fourth administrative hearing before ALJ Strauss in Queens, New York.  *Tr.* 960-1029.  A VE also testified at the Plaintiff's fourth administrative hearing.  *Tr.* 1006-1029.

The Plaintiff's applications for benefits were denied a fourth time in a written decision dated February 3, 2010. *Tr.* 527-48. The Plaintiff sought, and on April 7, 2012, was denied, review by the Appeals Council. *Tr.* 504-06, 508-22.

On June 6, 2012, the Plaintiff, who now resides within the Middle District of Pennsylvania,[4] filed, through counsel, a Complaint in this court appealing the Commissioner's final decision denying her Title II and Title XVI applications for benefits. *Doc.* 1. The jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). On August 27, 2012, the Commissioner filed an Answer together with a copy of the administrative record. *Docs.* 6, 7, 10. On November 11, the Plaintiff filed her brief. *Doc.* 11. On January 4, 2013, the Commissioner filed a response. *Doc.* 14. This appeal is now ripe for disposition.[5]

## II.  STATEMENT OF FACTS

The Plaintiff, born on April 28, 1955,[6] has a tenth grade education, and has some ability to read and write the English language.[7] The Plaintiff stopped

---

[4] On February 9, 2011, the Plaintiff's counsel notified the Appeals Council of the Plaintiff's change of address. The Plaintiff now resides within the Middle District of Pennsylvania. *Tr.* 507.

[5] Under the Local Rules of Court, "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." L.R. 83.40.1

[6] The Plaintiff was 41 years old as of her alleged onset date of August 18, 1996, and 44 as of her date last insured, September 30, 1999. The Plaintiff was 54 on the

working on August 18, 1996, after she slipped on several loose grapes that were left on the floor and fell, sustaining injuries to her back and knee, while working as a cashier at a grocery store.[8]  In a document she submitted to the Social Security Administration, the Plaintiff reported that she had prior work experience as a cashier, fast food worker, secretary, and camp counselor.  *Tr.* 255.  Based on this information and the Plaintiff's earnings records, a VE testified that the Plaintiff's only past relevant employment[9] was as a sales person at a carpet store.  *Tr.* 989-1003.  Pursuant to the Dictionary of Occupational Titles (DOT), her duties fell

---

date of the controlling ALJ decision.  For the purposes of her step five analysis of the Plaintiff's Title XVI claim the ALJ found that the Plaintiff was "closely approaching advanced age."  *See* 20 C.F.R. §§ 404.1563(d), and 416.963(d).  Where an individual is closely approaching advance age, the combined effect of age, a severe impairment, and limited work experience may seriously affect that individual's ability to adjust to other work.  *Id.*

[7] In a check-box disability report submitted to the Social Security Administration the Plaintiff reported that she could speak and read English, but could not write more than her own name.  *Tr.* 233.

[8] The Plaintiff testified that she filed a worker's compensation claim, which settled in 2004.  *Tr.* 1117.

[9] Past relevant work is defined as work that a Plaintiff has done within the past 15 years that was substantial gainful activity, and that lasted long enough for the Plaintiff to learn how to perform the position.  20 C.F.R. §§ 404.1560, 404.1565, 416.960, and 416.965.  With respect to her Title II claim, the ALJ found that the Plaintiff had past relevant work within the 15 years prior to date last insured.  With respect to her Title XVI claim, however, the ALJ found that the Plaintiff had no past relevant work within the 15 years prior to February 3, 2010, the date her claim was adjudicated by the Commissioner.

6

under a combination of two separate positions: floor coverings sales person, DOT 299.367-010, a light semi-skilled position; and, receptionist, DOT 237.367-038, a sedentary semi-skilled position. *Tr.* 1003.

In a written function report, and at a total of seven appearances before two different ALJ's, the Plaintiff described her limitations due to her physical and mental impairments. *Tr.* 45-164, 223-25, 227-31, 960-1193. As I write primarily for the benefit of the parties, I will provide an abbreviated summary of the Plaintiff's testimony.

In an undated adult function report form, the Plaintiff reported that her impairments impact her abilities to: sit; stand; walk; kneel; squat; climb; bend; lift; and reach. *Tr.* 230. In August 1998, the Plaintiff testified that she suffered from constant right knee pain dating back to August 18, 1996. She testified that she wore back and knee braces, and walked with the assistance of a cane. *Tr.* 153-54. She asserted that she could not bend, kneel, or squat, and could not sit for more than an hour or stand for more than 15 minutes without discomfort. *Tr.* 153-54

In March 1999, the Plaintiff testified that she was in constant back pain, her right leg was often too swollen for her knee brace, and that she still used a cane to walk. *Tr.* 104-06. She testified that she could walk one block before she needed to rest, and was unable to lift any significant amount of weight. *Id.* She asserted that

she could not sit for more than an hour without discomfort, and could not walk for more than 15 minutes at a time without stopping. *Tr.* 124.

In August 1999, the Plaintiff testified that she could not kneel, squat, or bend due to her back and knee pain. *Tr.* 60-66. She testified that she could not sit for more than 30 minutes without discomfort, could stand for up to 15 minutes at one time, and could no longer walk one block. *Id.* The Plaintiff reported that she was able to lift a maximum of ten pounds. *Id.*

In October 2005, the Plaintiff testified that she could not kneel, and needed to rest after walking half a city block. *Tr.* 1172, 1180. She testified that she could not sit for more than 2 hours with back pillows, or for 30 minutes without pillows, and could stand for up to 30 minutes at one time. *Tr.* 1172-1177, 1180. She asserted that she could lift one gallon of milk, but could not carry it constantly. *Tr.* 1180.

In April 2008, the Plaintiff testified that she walked with a cane, and needed to rest after walking less than half of one city block. *Tr.* 1136, 1151. She testified that she could sit for up to two hours without discomfort if she elevated her feet, and could stand for 5 to 10 minutes before she needed to sit. *Tr.* 1137. She asserted that she could lift up to 5 pounds. *Tr.* 1138. She reported that she stopped

wearing her back and knee braces in November 2007 because they no longer fit as a result of her weight gain. *Tr.* 1153.

In January 2010, the Plaintiff testified that she began using a wheelchair in 2004, but did not bring it to the ALJ hearing; at the hearing, the Plaintiff walked with a cane, and was assisted by her husband. *Tr.* 969. The Plaintiff testified that she could not stand more than a few minutes before she needed to sit. *Tr.* 970. She testified that Vicodin relieved all of her back and knee pain, but made her feel extremely groggy; she later recanted and said that the Vicodin only took the "edge off" her pain. *Tr.* 979, 982.

The Plaintiff testified that she was able to dress and bathe herself; during her October 2005 hearing, and in an undated function report, however, she stated that she was unable to bathe without assistance. *Tr.* 123, 228, 1174. In March 1999, she testified that she had been unable to drive for the past two years, and relied on her husband for transportation. *Tr.* 122-23. In April 2008, however, the Plaintiff testified that she drove three to four times per month to medical appointments. *Tr.* 1108. In January 2010, the Plaintiff testified, that she was no longer able to drive as of early 2009. *Tr.* 979. In October 2005, the Plaintiff testified that she was able to cook only once per week due to back pain, and accomplished this activity from a

seated position. *Tr.* 1178.  In April 2008, the Plaintiff testified she could no longer tie her own shoes. *Tr.* 1160.

With respect to her mental impairments, the Plaintiff testified that she experienced depression, which she attributed to her younger sister's death in November 1997, and her inability to work. *Tr.* 101-04, 162-63.  She stated that, following her sister's death, she and her husband went through a period of marital discord. *Tr.* 101.  She began to see Ms. Karnbad for weekly counseling sessions around the same time. *Tr.* 103.  In October 2005, the Plaintiff testified that her primary care physician, Dr. Kvetny prescribed Zoloft to treat her depression, but she did not resume treatment with a psychologist or psychiatrist because it was not covered by her insurance. *Tr.* 1186-87.

With respect to her obesity, the Plaintiff testified that she was 5 feet 3 inches tall, and weighed approximately 340 pounds at the time of her accident. *Tr.* 58, 108.  She reported significant weight loss, and recollected that in August 1998, she weighed 170 pounds. *Id.*  By March 1999, she testified that she weighed 200 pounds. *Id.*  In August 1999, the Plaintiff testified that she weighed 240 pounds. *Tr.* 58.  In October 2005, the Plaintiff testified that she weighed 268 pounds. *Tr.* 1181.  In May 2008, the Plaintiff testified that she weighed 301 pounds. *Tr.* 1107.

In January 2010, the Plaintiff testified that she weighed almost 400 pounds. *Tr.* 970.

### A.    Medical Records

On August 29, 1996, an x-ray of the Plaintiff's lumbosacral spine revealed mild disc space narrowing at L5-S1, and minor degenerative changes in the form of minimal anterior spur formation at L3-L4. *Tr.* 761.

On September 20, 1996, the Plaintiff underwent a neurological evaluation performed by Dr. Arthur Greenspan, M.D.   *Tr.* 735-37.   On examination, Dr. Greenspan noted the Plaintiff had: positive straight leg raise tests, bilaterally; pronounced painful spasm of the paravertebral musculature in the cervical and lumbar region; diminished range of motion of the neck and lower back on flexion, extension; diminished pain sensation in the right arm, right hand, and both legs; positive Bragard's test, bilaterally. *Id.*  He also reported that the Plaintiff walked with an antalgic gait. *Id.*  Dr. Greenspan diagnosed the Plaintiff with: internal derangement of the cervical and lumbar spine with bilateral radiculopathy; three herniated discs at C5; post-traumatic headaches, vertigo, anxiety and depressive syndrome, insomnia, and memory deficit. *Id.*  Further, he opined that the Plaintiff

was presently, totally disabled for an undetermined period of time due to her injuries.[10] *Id.*

On January 21, 1997, the Plaintiff was examined by Kelly O'Malley, M.D. *Tr.* 289-92. Following her examination Dr. O'Malley prepared a disability letter on the Plaintiff's behalf. *Id.* On examination Dr. O'Malley noted myospasm of the deep superficial cervical muscles upon palpitation, and a limited range of motion with pain. *Id.* She also observed severe and constant myospasm of the paravertebral muscles in the Plaintiff's thoracolumbar spine on palpitation, and a limited range of motion. *Id.* The Plaintiff also exhibited point tenderness with pain on the medial and lateral aspect of the patella down into the anterior surface of the tibia, and a limited range of motion. *Id.* Dr. O'Malley diagnosed cervical derangement, cervical myofascitis, lumbar derangement, lumbar myofascitis, and post contusion to left hip. *Id.*

On February 4, 1997, the Plaintiff was examined by state agency orthopedic consultant Kyung Seo, M.D. *Tr.* 312-13. The Plaintiff reported that, at that time,

---

[10] The ALJ found that the opinion of Dr. Greenspan was not entitled to controlling weight because opinions on the issue of disability are reserved to the Commissioner. *See* 20 C.F.R. § 404.1527, and 416.927; *Tr.* 540. The ALJ did not accord any significant weight to Dr. Greenspan's assessment because she found that it was unsupported by any specific findings or objective test results, and was inconsistent with the clinical findings of non-treating examining Drs. Seo and Park. *Tr.* 544.

she was attending physical therapy sessions three times per week. *Id.* On examination, Dr. Seo noted the Plaintiff had no difficulty rising from a seated position or getting on or off the examination table. *Id.* Dr. Seo observed normal cervical lordosis, normal range of motion in the upper extremities and shoulders. *Id.* The straight leg raising test was positive in the supine position but negative in the seated position. *Id.* Dr. Seo reported the impressions of: status-post contusion of the left side of the body, myofascial pain of the left shoulder and thigh, and chronic muscle strain of the paraspinal muscle of the lower back. *Id.*

On the same day, radiology films of the Plaintiff's left hip and lumbosacral spine were evaluated by Richard B. Rafal, M.D. *Tr.* 314. Two views of the left hip showed no evidence of acute fracture, dislocation, or destructive bony lesion; the joint spaces were well-maintained. *Id.* Two views of the lumbosacral spine showed normal lumbar lordosis, no vertebral collapse, subluxation or significant disc space narrowing. *Id.* There were small anterior osteophytes from L3 to L5. *Id.*

On July 16, 1997, the Plaintiff was examined by state agency consulting internist, Dr. Soo Park. *Tr.* 317-19. Dr. Park observed that the Plaintiff was able to dress and undress, and get on and off the examination table without difficulty. *Id.* On examination, Dr. Park noted lumbar lordosis was present with no scoliosis,

paravertebral muscle spasms, or tenderness, a full range of motion in the cervical spine, and varicose veins in both legs. *Id.* The Plaintiff's lumbar spine ventral flexion was 70 degrees, dorsiflexion was 20 degrees, and lateral flexion was 20 degrees. *Id.* Dr. Park's final impression was that the Plaintiff had: a history of pain in her lower back and right leg with a slightly diminished range of motion; a history of IBS which was adequately controlled by medication; and, a history of anxiety with marital problems. *Id.*

On August 6, 1997, the Plaintiff was examined by Dr. Wilson at the Advanced Medical Care and Diagnostic Center with complaints of ongoing symptoms related to her workplace injury. *Tr.* 343-45. Dr. Wilson observed that the Plaintiff walked with a cane. *Id.* On physical examination, Dr. Wilson noted: a limited range of motion in the Plaintiff's cervical spine, thoracic spine, lumbar spine, and right knee; severe tenderness in the cervical spine, and significant tenderness and spasm in her thoracic and lumbar spine; and medial joint tenderness in the right knee. *Id.* Dr. Wilson assessed: cervical, thoracic, and lumbar radiculitis; and internal derangement of the right knee. *Id.*

On October 9, 1997, the Plaintiff underwent an upper extremity somatosensory evoked potential study at the Advanced Medical Care and Diagnostic Center. *Tr.* 342. The study yielded normal results. *Id.* On November

13, 1997, the Plaintiff underwent a lower extremity somatosensory evoked potential study at the Advanced Medical Care and Diagnostic Center. *Tr.* 341. The results of the study were consistent with bilateral lumbosacral radiculopathy. *Id.*

In February 2008, a musculoskeletal medical report was submitted by the Advanced Medical Care and Diagnostic Center, where the Plaintiff was treated 2 to 3 times per week between August 1997 and February 2008. *Tr.* 329-30. The report stated that on February 2, 1998, the Plaintiff presented with bilateral cervical paraspinal musculature spasm, right quadratus lumborum spasm, and decreased motor power on cervical side bending and right knee flexion and extension. *Id.* The Plaintiff also complained of depression. *Id.*

On April 25, 1998, an MRI of the Plaintiff's right knee was taken. *Tr.* 358. The MRI results gave the impression of a complex tear of the medial meniscus, small joint effusion. *Id.* Clinical corroboration was recommended for a suspected lateral subluxation of the patella. *Id.*

On July 17, 1998, the Plaintiff had an x-ray taken of her chest. *Tr.* 399. The x-ray showed no significant abnormalities. *Id.* On the same day a sonogram of the Plaintiff's thyroid was also normal. *Id.*

On July 27, 1998, the Plaintiff was examined by orthopedist Leon M. Bernstein, M.D., after being referred by Dr. Wilson.   *Tr.* 487, 912-23.   On examination, Dr. Bernstein noted no deformity at the lumbar spine, a positive straight leg raise at 60 degrees bilaterally, a range of motion of 110 degrees in both knees, varicose veins on the right side, and an inability to flexion load due to anterior pain on the right side.   *Id.*   Dr. Bernstein reported the impression of right knee internal derangement due to traumatic aggravation of arthrosis.   *Id.*   He recommended use of a cane, and continued physical therapy.   *Id.*   Dr. Bernstein also submitted a request for arthroscopy authorization to the Plaintiff's insurance carrier.   *Id.*

From March 1998 through September 1998 the Plaintiff attended weekly counseling sessions with a social worker, Deborah Karnbad, M.S.W.   *Tr.* 425-50. Ms. Karnbad stated that the purpose of the counseling sessions was to help the Plaintiff manage her life in more effective ways.   *Tr.* 427.   During these sessions the Plaintiff often voiced concerns about her tumultuous relationship with her husband, and made frequent complaints that she was in constant pain.   *Tr.* 431-50.

16

Ms. Karnbad assessed that the Plaintiff had a global assessment of functioning (GAF) score of 50.[11]  *Tr.* 431.

On November 11, 1998, the Plaintiff was examined by state agency psychology consultant Frank Vaccaro, Ph.D.  *Tr.* 451-53.  On the WAIS-R the Plaintiff obtained I.Q. scores placing her in the borderline range of intelligence.  *Id.* Dr. Vaccaro also administered the Bender-Gestalt Test, House-Tree-Person Test, Thematic Apperception Test, and Rorschach Test.  *Id.*  Dr. Vaccaro noted that his assessment was indicative of borderline cognitive capabilities, and concluded that the Plaintiff's mental impairments did not allow her to integrate her thoughts effectively, her attentive behavior was fragmented, her memory was poor, and her judgment was inappropriate at times.  *Id.*

On July 18, 2000, the Plaintiff underwent an arthroscopy of the right knee; the surgery was performed by Dr. Bernstein.  *Tr.* 486.  Dr. Bernstein's post-operative diagnosis was mild arthropathy of the right knee with probable fractures

---

[11] The GAF score allows a clinician to indicate her judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness.  *Diagnostic and Statistical Manual of Mental Disorders* 32-35 (4th ed. text. rev. 2000).  A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range.  *Id.*  The score is useful in planning treatment and predicting outcomes.  *Id.*  A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.  *Id.*  The ALJ did not address the GAF score assessed by Ms. Karnbad in her decision.

osteophyte in the posterior pole of the patella and osteochondral fragment in the region of the superior pole of the patella, in addition to advance chondromalacia of the patella diffusely, generalized synovitis of the knee, and stage II-III chondromalacia in both tibial plateaus. *Id.* In his treatment notes from July 28, 2000, and August 23, 2000, Dr. Bernstein stated that the Plaintiff was under a total disability.[12] *Tr.* 484.

On February 20, 2002, x-rays of the Plaintiff's knee showed no obvious fractures, dislocations or subluxations. *Tr.* 747. There was, however, evidence of tricompartmental degenerative changes. *Id.*

On February 28, 2002, the Plaintiff was examined by Robert Drazic, D.O. *Tr.* 749. On examination of her right knee, Dr. Drazic noted: no effusion; a 0 degree range of motion on extension, and 120 degree range of motion on flexion, negative anterior/posterior drawer, varus/valgus stress; and, positive McMurray's test, patella grind, and crepitus. *Id.* On examination of the lumbar spine Dr. Drazic also noted: no paravertebral muscle spasms; a range of motion of 40 degrees on flexion and 5 degrees on extension; left and right side bending was 20 degrees, and left and right rotation was 30 degrees. *Id.* On March 28, 2002, Dr.

---

[12] The ALJ found that the opinion of Dr. Bernstein was not entitled to controlling weight because opinions on the issue of disability are reserved to the Commissioner. *See* 20 C.F.R. §§ 404.1527, and 416.927; *Tr.* 540. The ALJ did not address the specific probative value he assigned to Dr. Bernstein's opinion.

Drazic re-examined the Plaintiff, and reported the impression of lumbar spine strain/stress with right knee internal derangement and status-post arthroscopic surgery. *Tr.* 748. Treatment notes from monthly examinations by Dr. Drazic between March 2002 and September 2002, and one examination from February 2003, showed minimal changes. *Tr.* 742-50.

On July 23, 2003, the Plaintiff was examined by a new family physician, Gennadiy Kvetny. *Tr.* 752, 796. An ECG from the same date was normal. *Tr.* 811. Dr. Kvetny's treatment notes reflect that the Plaintiff was examined approximately once per month between 2003 and early 2009, and was treated for asthma, hypertension, depression, obesity, varicose veins, arthritis, IBS, and chronic lower back and right knee pain. *Tr.* 793-909, 946, 948-52. In his letters dated February 10, 2005, and August 26, 2008, he noted that the Plaintiff's blood pressure, asthma, and depression were reasonably controlled with medications, but her lower back pain and arthritis were not. *Tr.* 752, 943-44.

On September 22, 2003, a dual photon densitometry procedure was performed on the Plaintiff's lumbar spine. *Tr.* 905-06. There was no evidence of osteoporosis or osteopenia in either the lumbar spine or the hips. *Id.* A radiograph of the frontal and lateral chest, performed the same day, revealed no evidence of active chest disease. *Tr.* 903.

On November 10, 2003, the Plaintiff had an ECG. *Tr.* 908. The results were normal. *Id.* An ECG from March 30, 2004, however, revealed a borderline left atrial abnormality. *Tr.* 895.

On May 13, 2004, the Plaintiff underwent a venous ultrasound of both legs. *Tr.* 889-92. The venous duplex study showed bilateral insufficiency, and small plaque formation in the right greater saphenous and lesser saphenous veins with no evidence of deep vein thrombosis (DVP) or any hemodynamically significant abnormality. *Id.*

On July 5, 2005, the Plaintiff had an ECG. *Tr.* 875. The test revealed the presence of a borderline intraventricular conduction delay; the results otherwise unremarkable. *Id.* An ECG performed on November 21, 2005, revealed the presence of a borderline left atrial abnormality, the results were otherwise unremarkable. *Tr.* 874.

On January 16, 2006, the Plaintiff had an ECG. *Tr.* 873. The results were unremarkable. *Id.*

On April 11, 2006, the Plaintiff underwent an upper endoscopy based on complaints of mid-abdominal discomfort, and rectal bleeding. *Tr.* 883-888. The endoscopy showed a possible prepyloric ulcer, and a biopsy for helicobacter pylori was negative. *Id.*

20

On June 6, 2006, the Plaintiff was examined by Ralph Almelch, M.D., with complaints of three masses on her lower back.  *Tr.* 782.  On June 14, 2006, the Plaintiff had an ECG with normal results.  *Tr.* 872.  On June 19, 2006, the masses were surgically removed.  *Tr.* 763-77.  Post-operative pathology reports reveal that the masses were benign; the Plaintiff was diagnosed with lipoma.  *Tr.* 778-81.

On October 25, 2006, the Plaintiff was examined by Donald I. Goldman, M.D., during an orthopedic surgical consultation at attorney's request.  *Tr.* 784-88. He reported that the Plaintiff used a cane to ambulate, and walked in a slow guarded manner.  *Id.*  On examination of the Plaintiff's right knee, Dr. Goldman observed effusion, pain on patella compression and over the medial and odd facet of the patella, pain with attempted flexion loading, and a range of motion restricted to 100 degrees with patella and femoral pain.  *Id.*  The Plaintiff was unable to kneel, squat, or bend as a result of guarding with pain.  *Id.*  On examination of the Plaintiff's lumbar spine, Dr. Goldman noted that trunk flexion was restricted to a range between 40 and 45 degrees with pain, the straight leg raise test was positive bilaterally at 50 to 60 degrees both lying and sitting, and left lateral bending was painful but complete.  *Id.*  Dr. Goldman reported a final impression of: morbid obesity; status-post surgery of her right knee; tri-compartmental advanced osteoarthritis; and lumbar derangement with radiculopathy.  *Id.*

21

On January 8, 2007, the Plaintiff was scheduled to have an MRI of her lumbosacral spine.  *Tr.* 898.  The test could not be performed due to the Plaintiff's claustrophobia.

On March 19, 2007, the Plaintiff had an ECG, which revealed the presence of a borderline right atrial abnormality; the results were otherwise unremarkable. *Tr.* 882.  An ECG performed on August 13, 2007, revealed the presence of a borderline left atrial abnormality.  *Tr.* 941.

On December 22, 2009, the Plaintiff was examined by psychologist Wendy Fischer, Ph.D.  *Tr.* 954-959.  Dr. Fischer diagnosed the Plaintiff with post-traumatic stress disorder, dysthymia, borderline intellectual functioning, and reading disorder.  *Id.*  She assigned the Plaintiff a GAF score of 41.  *Id.*

## B.     Medical Opinion Evidence

### 1.     Kelly O'Malley, M.D.

On January 21, 1997, Dr. Kelly O'Malley prepared a disability letter on the Plaintiff's behalf.  *Tr.* 289-92.  At the conclusion of her letter, Dr. O'Malley opined that the Plaintiff was totally disabled, but did not discuss any specific functional limitations.  *Id.*

The ALJ found that Dr. O'Malley's opinion was not entitled to controlling weight because opinions on the issue of disability are reserved to the

22

Commissioner. *See* 20 C.F.R. §§ 404.1527, and 416.927; *Tr.* 540. The ALJ concluded that Dr. O'Malley's opinion did not warrant significant weight because her assessment was inconsistent with the clinical observations of Drs. Seo and Park. *Tr.* 544.

### 2. Kyung Seo, M.D.

On February 4, 1997, state agency consulting orthopedist, Dr. Kyung Seo, issued a medical opinion regarding the Plaintiff's physical RFC based on a one-time physical examination. *Tr.* 312-13. Dr. Seo opined the Plaintiff's prognosis was fair, and found that:

> [D]ue to aching pain of the left thigh and left arms and muscle spasm of the paraspinal muscles of the lower back mild, presently she has some difficulty sitting, standing, and carrying heavy objects. Presently she is able to sit, stand approximately one hour without interruption. Able to walk ten blocks. Able to lift, carry approximately twenty pounds.

*Id.*

The ALJ accorded significant weight to Dr. Seo's assessment. *Tr.* 543. The ALJ found that, although Dr. Seo's opinion was based on only one examination, the assessment was supported by a thorough examination and was consistent with the record as a whole. *Id.*

### 3.    C. A. Montorfano, M.D.

On February 20, 1997, state agency medical reviewer C.A. Montorfano, M.D., concluded that, based in his review of the available medical records, the Plaintiff "had symptoms relating to strain/sprain but there [was] no definitive evidence of discogenic disease/radiculopathy. *Tr.* 210. He opined that the Plaintiff could be expected to perform medium[13] work before August 1997. *Id.*

The ALJ did not assign any significant weight to Dr. Montorfano's assessment. *Tr.* 545.

### 4.    Harold R. Cook, M.D.

On February 28, 1997, state agency medical reviewer Dr. Harold R. Cook completed a physical RFC assessment form evaluating the Plaintiff's primary and secondary diagnoses of "disorders of the spine" and "cervical derangement" based on his review of the Plaintiff's medical records. *Tr.* 211-18. Dr. Cook opined there was no definitive evidence of discogenic disease, and noted that the Plaintiff's conditions would not last for one year. *Id.* Dr. Cook assessed that the Plaintiff had the requisite RFC to: occasionally lift or carry fifty pounds and frequently lift or carry twenty-five pounds; stand or walk for up to six hours per

---

[13] Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, that person can also do sedentary or light work. 20 C.F.R. §§ 404.1567(c), and 416.967(c).

eight-hour workday, and sit for up to six hours per eight-hour workday; and, push or pull within the weight limits of her lift and carry restrictions. *Id.* Dr. Cook opined the Plaintiff had no established postural, manipulative, visual, communicative, or environmental limitations. *Id.*

The ALJ did not assign significant weight to Dr. Cook's assessment.[14] *Tr.* 545.

### 5. Soo Park, M.D.

On July 16, 1997, state agency consulting internist Dr. Soo Park examined the Plaintiff. *Tr.* 317-19. Dr. Park confirmed the Plaintiff was limited to a "moderate degree of lifting, bending, standing and walking." *Id.* She reported that the Plaintiff's prognosis was fair. *Id.*

The ALJ accorded significant weight to Dr. Park's assessment. *Tr.* 543. The ALJ found that, although Dr. Park's opinion was based on only one examination, the assessment was supported by a thorough examination and was consistent with the record as a whole. *Id.*

---

[14] Dr. Cook's opinion is identified as Exhibit 2E in the administrative record. *Tr.* 211-18. The ALJ addressed Exhibit 2E once in her decision but incorrectly identified the reviewing physician as Dr. Montorfano. *Tr.* 545.

### 6.    A. Buonocore, M.D.

On August 12, 1997, state agency medical reviewer, Dr. A. Buonocore completed a physical RFC assessment form evaluating the Plaintiff's primary and secondary diagnoses of "low back sprain" and "anxiety" based on his review of the Plaintiff's medical.   *Tr.* 321-28.   Dr. Buonocore assessed the Plaintiff had the requisite RFC to: occasionally lift or carry twenty pounds and frequently carry ten pounds; stand or walk six hours per eight-hour workday, and must periodically alternate sitting and standing to relieve discomfort; and, push or pull up to twenty pounds.   *Id.*   Dr. Buonocore also found that the Plaintiff had several postural limitations, and as a result could: never climb; and only occasionally balance, stoop, kneel, crouch, and crawl.   *Id.*   Dr. Buonocore found the Plaintiff had no manipulative, visual, communicative, or environmental limitations.   *Id.*

The ALJ accorded significant weight to Dr. Buonocore's assessment because the opinion was consistent with the medical opinions by examining Drs. Seo and Park. *Tr.* 543.

### 7.    Stephen Wilson, M.D.

Between February and May 1998, treating physician Dr. Stephen Wilson completed three check-box assessments of the Plaintiff's ability to perform work-related activities.   On February 3, 1998, Dr. Wilson completed his first assessment

form, on which he opined the Plaintiff had the requisite RFC to: occasionally lift or carry 0 to 5 pounds; stand or walk a total of two hours per eight-hour workday; and, sit a total of two hours per eight-hour workday. *Tr.* 339-40. Dr. Wilson also identified several manipulative and environmental limitations including: limitations in the Plaintiff's abilities to grasp and perform tasks requiring fine manipulation with both hands, and push or pull with both hands and legs; recommendations that the Plaintiff avoid all exposure to unprotected heights, moving machinery, changes in temperature and humidity, and exposure to dust or fumes; and, inability to drive automotive equipment. *Id.* Dr. Wilson also noted that the Plaintiff's condition caused pain, and that she had difficulty handling low levels of stress. *Id.* Further, Dr. Wilson reported that the medication he prescribed caused several side-effects including, drowsiness, nausea, and impaired concentration. *Id.*

On February 12, 1998, Dr. Wilson completed a second physical RFC assessment form. *Tr.* 331-33. On his second assessment form, Dr. Wilson opined the Plaintiff had the requisite RFC to: carry 0 to 5 pounds; stand or walk for a total two hours per eight-hour workday, and sit for a total of two hours per workday. *Id.* Dr. Wilson also found that the Plaintiff had several postural limitations, and as a result could never climb, crouch, balance, kneel, stoop, or crawl. *Id.* He noted the

Plaintiff was limited in her abilities to reach, handle, feel, and push and pull, but did not find that the Plaintiff had any visual, communicative, or environmental limitations. *Id.*

On May 22, 1998, Dr. Wilson completed a third physical RFC assessment form. *Tr.* 336-37. On his third assessment form, Dr. Wilson opined that the Plaintiff had the requisite RFC to: occasionally lift or carry 0 to 5 pounds; stand or walk a total of two hours per eight-hour workday; and, sit a total of two hours per eight-hour workday. *Id.* Dr. Wilson also identified several manipulative and environmental limitations including: limitations in the Plaintiff's abilities to grasp with both hands, and push or pull with both hands and legs; recommendations that the Plaintiff avoid all exposure to unprotected heights, moving machinery, changes in temperature and humidity, and exposure to dust or fumes; and, inability to drive automotive equipment. *Id.* Dr. Wilson also noted that the Plaintiff's condition caused pain, and that she had difficulty handling both low and moderate levels of stress. *Id.*

On the same date, Dr. Wilson completed a form letter in which he opined that the Plaintiff could not return to her former employment as a cashier, and was unable to perform other full time work. *Tr.* 335. He also stated that the Plaintiff's

prognosis for a full recovery was guarded, and he expected that her impairments would last for at least another 12-18 months.  *Id.*

The ALJ accorded little weight to Dr. Wilson's assessment.  *Tr.* 543.  She found that Dr. Wilson's opinion was inconsistent with the Plaintiff's activities of daily living, including her testimony that she was able to drive a car three times per week in 1999, and was unsupported by the evidence of record.  *Id.*  Furthermore, the ALJ accorded no weight to Dr. Wilson's opinion that the Plaintiff had difficulty handling stress because Dr. Wilson did not treat the Plaintiff for any psychiatric impairment.  *Tr.* 541.

### 8.    Gilbert Young, M.D.

On August 30, 1999, Dr. Gilbert Young testified as a medical expert in the field of orthopedics at the second supplemental hearing prior to ALJ's first decision dated  October 28, 1999, denying her applications for benefits.  *Tr.* 72-90.  Dr. Young's opinion was based upon his review of the medical records, and on the Plaintiff's hearing testimony.  *Id.*  Dr. Young opined that he did not believe the Plaintiff had a meniscal tear.  Dr. Young testified that the Plaintiff did not meet medical listings 1.05C or 1.13, but stated that he was unable to testify as to the Plaintiff's RFC.  *Id.*

At step two of the sequential evaluation process, the ALJ accorded significant weight to Dr. Young's testimony because "he reviewed the record at the time," and had the appropriate expertise and knowledge of the Social Security Regulations. *Tr.* 533. The ALJ did not address the probative weight of Dr. Young's opinion during her RFC assessment.

### 9.   Robert Drazic, D.O.

On May 15, 2002, Dr. Drazic wrote a letter in which he opined, without elaboration, that the Plaintiff was permanently disabled due to the injury to her right knee sustained on August 18, 1996. *Tr.* 741.

The ALJ stated that she relied upon the examination findings of Dr. Drazic in his RFC assessment, but noted that Dr. Drazic did not provide an RFC assessment. *Tr.* 543

### 10.   Kerin Hausknecht, M.D.

On January 4, 2003, Kerin Hausknecht, M.D., a pain management specialist, completed a check box-type disability evaluation. *Tr.* 760. Dr. Hausknecht opined that the Plaintiff was temporarily disabled due to lumbosacral spine derangement, and right knee injury, but did not identify any specific functional limitations. *Id.* Dr. Hausknecht reported that the Plaintiff's prognosis was guarded. *Id.*

The ALJ did not address the probative value of Dr. Hausknecht's opinion in her decision.[15]

### 11.    Gennadiy Kvetny, M.D.

On February 8, 2005, Dr. Kvetny completed a multiple impairments questionnaire. *Tr.* 753-59.  Dr. Kvetny assessed that the Plaintiff had the requisite RFC to: occasionally lift or carry 5 to 10 pounds; sit for a total of three hours per eight-hour workday, stand or walk for a total of one hour per eight-hour workday, and recommended that the Plaintiff be permitted to get up and move around hourly.  *Id.*  Dr. Kvetny also identified several postural and manipulative limitations including: an inability to push, pull, kneel, bend, and stoop; a moderate limitation in her ability to raise her arms for reaching; and minimal limitations in her abilities to grasp with both hands, and use her hands for fine manipulations.  *Id.* Dr. Kvetny recommended that the Plaintiff avoid exposure to temperature extremes, and that the Plaintiff's ability to work was further limited by psychological impairments.  *Id.*  He opined that the Plaintiff was capable of working in a low stress environment, but would frequently require unscheduled

---

[15] In her decision the ALJ wrote that "[e]xtreme limitations indicated on the forms by other treating physicians are also not consistent with the claimant's testimony as to her abilities." *Tr.* 541.  Dr. Hausknecht's opinion is the only check-box type opinion not specifically addressed by the ALJ's decision.

breaks lasting 30 to 50 minutes in duration, and would be absent from work more than three times per month.  *Id.*

In a letter dated February 10, 2005, Dr. Kvetny opined that the Plaintiff would be unable to perform full-time work for at least twelve months, and was otherwise disabled.  *Tr.* 752.

In a second opinion letter dated August 26, 2008, Dr. Kvetny opined that the Plaintiff's:

> [L]ower back pain and arthritis cause constant pain to her back, knees and hips that is precipitated by walking long, bending, squatting, and sitting long.  Her chronic pain is compounded by her obesity. Throughout her treatment Mrs. Reichling has had a Body Mass Index greater than 40.  As a result of her constant pain, Mrs. Reichling would need to take frequent unscheduled breaks lasting between 30 and 50 minutes.  She would likely be absent from work as a result of her pain more than three times a month.  Her constant pain significantly limits her ability to grasp, twist, or perform fine manipulations.  It is my opinion that she should not push, pull, kneel, bend, or stoop.  I also believe that Mrs. Reichling's impairments prevent her from sitting more than 3 hours in an 8-hour workday and standing or walking more than 1 hour in an 8-hour workday.  I would recommend that she does not sit continuously and that she be permitted ready access to a restroom.
>
> Additionally Mrs. Reichling is immunocompromised.  As a result of her impairments and treatment, she is prone to infections.  This susceptibility to infection raises further concern about her ability to perform a full-time job.
>
> In my opinion she is not able to perform full time work for at least 12 months and is otherwise disabled.

*Tr.* 943-44.

The ALJ found that Dr. Kvetny's opinion was not entitled to great or controlling weight as it was unsupported by his treatment notes, which reflected only "periodic treatment for minor complaints involving non-severe impairments such as hypertension, asthma, and depression, all of which were well controlled through medication" and because opinions on the issue of disability are reserved to the Commissioner. *See* 20 C.F.R. §§ 404.1527, and 416.927; *Tr.* 540, 543. She also found that his opinion was inconsistent with the evidentiary record as a whole. *Id.*

### 12.   Donald I. Goldman, M.D.

On October 25, 2006, the Plaintiff underwent an orthopedic surgical consultation performed by Donald Goldman, M.D., per her attorney's request. *Tr.* 784-88.   In his examination notes, Dr. Goldman noted that the severity of the Plaintiff's low back and right knee injuries prevented her from working any environment that would require her to sit for more than 20 to 25 minutes, walk more than one block, engage in repetitive lifting, twist, crawl, run, jump, kneel, squat, or climb stairs; he opined that it would be virtually impossible for the Plaintiff to perform any of these activities due to pain and guarding, and morbid obesity. *Id.*

On November 2, 2006, Dr. Goldman completed a lumbar spine impairment questionnaire based on his examination, and review of the Plaintiff's medical records. *Tr.* 930-36. On this assessment form, Dr. Goldman opined that the Plaintiff had the requisite RFC to: occasionally lift or carry 0 to 5 pounds; sit for a total of two to three hours per eight-hour workday, stand or walk for a total of one hour per eight-hour workday, and stated that that the Plaintiff must be permitted to get up and move around for a for a few minutes after 15 to 20 minutes of work. *Id.* Dr. Goldman also identified several postural and environmental limitations including: an inability to push, pull, kneel, bend, and stoop; and a need to avoid temperature extremes. *Id.* Dr. Goldman asserted that: he expected the Plaintiff's impairments to last more than twelve months; her pain would frequently interfere with her concentration; she would require unscheduled work breaks every 25 to 30 minutes; and would likely be absent from work more than three times per month as a result of her impairments. *Id.*

The ALJ found that Dr. Goldman's opinion was not entitled to controlling weight, as Dr. Goldman examined the Plaintiff on one occasion to obtain a report

in support of her claim for disability.[16]  *Tr.* 544.  The ALJ accorded little weight to Dr. Goldman's opinion as it was inconsistent with the clinical findings of the Plaintiff's treating orthopedist, Dr. Bernstein, and with the medical opinion and clinical findings of consulting examiner, Dr. Seo.  *Id.*

### 13.  Roger Rahtz, Ph.D.

On July 16, 1997, state agency consulting psychologist Dr. Roger Rahtz examined the Plaintiff.  *Tr.* 315-16.  Dr. Rahtz noted during the mental status examination that the Plaintiff had deficits in self-esteem with depressive preoccupations but no suicidal thoughts, a moderately depressed mood, and her affect was easily frustrated and irritable with underlying sadness.  *Id.*  Dr. Rahtz noted that the Plaintiff's intellectual capacity was average.  *Id.*  Dr. Rahtz opined that the Plaintiff had "significant limitations in her personal and social adjustment," and that her ability to respond to work pressures was reduced by her psychiatric condition.  *Id.*  Dr. Rahtz diagnosed adjustment disorder with mixed emotional features including depression and irritability.  *Id.*  Dr. Rahtz reported that the Plaintiff's prognosis was guarded.  *Id.*

---

[16] A medical source is not considered a treating source if the Plaintiff's relationship with the source is not based on a medical need for treatment or evaluation, but instead is solely based on a need to obtain a report in support of a claim for disability.  A report obtained under these circumstances is considered to be an opinion by a non-treating source.  20 C.F.R. §§ 404.1502, and 416.902.

The ALJ found that, to the extent that Dr. Rahtz's opinion means that the Plaintiff did not have a severe mental impairment, she accorded it significant weight, but otherwise, she found the assessment to be inconsistent with the Plaintiff's conservative treatment history and activities of daily living. *Tr.* 545.

### 14.    Frank Vaccaro, Ph.D.

On November 23, 1998, psychologist Dr. Vaccaro completed an assessment of the Plaintiff's ability to do work-related activities in light of her mental limitations. *Tr.* 454-56.   Dr. Vaccaro assessed that the Plaintiff: had "fair" ability to follow work rules, relate to co-workers, and interact with supervisors; and, had "no or poor" ability to deal with the public, use judgment, deal with work stress, function independently, or maintain attention and concentration. *Id.*  He opined that she had fair ability to understand, remember and carry out simple instructions, but had no or poor ability to understand, remember and carry out detailed or complex instructions. *Id.*  Dr. Vaccaro also opined that the Plaintiff had no or poor ability to maintain her personal appearance, behave in an emotionally stable manner, relate predictably in social situations, or demonstrate reliability. *Id.*

The ALJ accorded minimal weight to Dr. Vaccaro's assessment because she found it was inconsistent with the Plaintiff's medical record, including test results indicative of normal intelligence from one year earlier, and was inconsistent with

the Plaintiff's work history, which indicates she was able to perform several skilled and semi-skilled positions. *Tr.* 541. The ALJ also observed there was no indication that the Plaintiff's level of intellectual functioning decreased after her accident. *Id.*

### 15. Annelise Pontius, M.D.

At the Plaintiff's March 30, 1999, administrative hearing, psychiatrist Annelise Pontius, M.D., testified as a medical expert. *Tr.* 126-138. Dr. Pontius opined that the Plaintiff did not suffer from a 12.00 listing. *Id.* Dr. Pontius also testified that Dr. Vaccaro failed to give a diagnosis with his assessment, and was not specific as to the degree to which the Plaintiff's concentration was impaired by her depression. *Id.* Dr. Pontius also opined that Dr. Vaccaro's assessment was inconsistent with the Plaintiff's work history, and placed too much emphasis on the Plaintiff's physical impairments. *Id.*

When cross-examined about Dr. Vaccaro's assessment that the Plaintiff had a borderline range of intelligence, Dr. Pontius testified that intelligence determination was done by a psychologist, and because she is a psychiatrist, it was not in her field. *Tr.* 136.

The ALJ did not address probative value of Dr. Pontius' testimony in her decision.

### 16.   Wendi Fischer, Ph.D.

After examining the Plaintiff in December 2009, psychologist Wendi Fischer, Ph.D., opined that the Plaintiff was unable to perform gainful employment due to her PTSD symptoms, including: emotional liability; irritability; poor interpersonal relations; sadness; anhedonia; and, difficulties with information processing and retention.   *Tr.* 959.   Dr. Fischer stated that the above-listed symptoms impact the Plaintiff's abilities in the areas of social, emotional, and occupational functioning.   *Id.*   Specifically, Dr. Fischer found:

> Results of her current assessment indicate that [the Plaintiff] is functioning on a very low cognitive level.   According to the Wechsler Adult Intelligence Scale – Fourth Edition (WAIS-IV), [the Plaintiff]'s level of cognitive functioning is in the borderline range of with rote short term memory, mental manipulation ability, and ability to acquire, retain, and retrieve general factual knowledge in the extremely low range.   This is consistent with the results of her previous psychological evaluation.   Assessment of her Reading ability indicates that she is functionally illiterate, which is commensurate with her level of cognitive functioning.   Assessment of her socio-economic functioning indicates that [the Plaintiff] meets the criteria for the diagnosis of Post Traumatic Stress Disorder (PTSD) related to the traumatic stressor of loss of her family as she knew it, her school environment, and her childhood world which was exacerbated to a more extreme level in 1996 when she suffered the loss of employment due to her fall and subsequent injuries.

*Id.*

The ALJ found that Dr. Fischer's opinion was not entitled to controlling weight, as Dr. Fischer examined the Plaintiff on one occasion to obtain a report in

support of her claim for disability. *Tr.* 542. The ALJ did not accord Dr. Fischer's

opinion any significant weight based on her limited relationship with the Plaintiff,

the fact that she was not a specialist in psychiatry, and because she found it was

inconsistent with the Plaintiff's medical record and work history. *Id.*

## III.   DISCUSSION

In her brief, the Plaintiff asserts that ALJ Strauss' decision, dated February

3, 2010, is unsupported by substantial evidence and "infected" with legal error.

The Plaintiff argues that the ALJ failed to properly evaluate the medical records in

two regards.  The Plaintiff asserts that the ALJ erred by failing to address the

Plaintiff's mental impairment at step two of her evaluation, an error which, she

asserts, was then further compounded by an incomplete evaluation of the medical

evidence of her mental limitations.  Next, the Plaintiff argues that the ALJ did not

properly weigh the medical evidence with respect to the Plaintiff's severe

impairments of degenerative disc disease of the lumbar spine, right knee internal

derangement with status post arthroscopic surgery, and obesity.  Last, the Plaintiff

asserts that the ALJ's flawed evaluation of the medical evidence tainted her

consideration of the Plaintiff's subjective testimony.

In response, the Commissioner asserts that the ALJ properly evaluated the

medical evidence of record, and supported her decision with substantial evidence.

### A.   Standards of Review–The Roles of the Administrative Law Judge and This Court

#### 1.   Initial Burdens of Proof , Persuasion and Articulation for the ALJ

Resolution of the instant social security appeal involves an informed consideration of the respective roles of two adjudicators–the ALJ and this court. At the outset, it is the responsibility of the ALJ in the first instance to determine whether a Plaintiff has met the statutory prerequisites for entitlement to benefits. To receive benefits, the Plaintiff must present evidence which demonstrates that the claimant has an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."    42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

Furthermore,

An individual shall be determined to be under a disability only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do his previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant

numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A); *see also* 42 U.S.C. § 1382c(a)(3)(B).

In making this determination the ALJ employs a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. §§ 404.1520, and 416.920. If the ALJ finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed any further. *See* 20 C.F.R. §§ 404.1520(a)(4), and 416.920(a)(4). As part of this analysis the ALJ must sequentially determine: (1) whether the Plaintiff is engaged in substantial gainful activity;[17] (2) whether the Plaintiff has a severe impairment;[18] (3) whether the

---

[17] Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit." 20 C.F.R. §§ 404.1510, and 416.910.

[18] The determination of whether a Plaintiff has any severe impairment at step two of the sequential evaluation process is essentially a threshold test. 20 C.F.R. §§ 404.1520(c), and 416.920(c). If a Plaintiff has no impairment or combination of impairments which significantly limits the Plaintiff's physical or mental abilities to perform basic work activities, the Plaintiff is "not disabled" and the evaluation process ends at step two. *Id.* If a Plaintiff has any severe impairment, the evaluation process continues. Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923, and 416.945(a)(2). An impairment significantly limits a Plaintiff's physical or mental abilities when its effect on the Plaintiff's ability to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, reach, climb, crawl, and handle. 20 C.F.R. §§ 404.1545(b), and 416.945(b). An individual's basic mental or non-exertional

Plaintiff's impairment meets or equals a listed impairment;[19] (4) whether the Plaintiff's impairment prevents the claimant from doing past relevant work;[20] and (5) whether the Plaintiff's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520, and 416.920.

Before beginning step four of this process, the ALJ must also determine the Plaintiff's residual functional capacity (RFC).   20 C.F.R. §§ 404.1520(e), and 416.920(e).   RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett v. Comm. of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); *see also* 20 C.F.R. §§ 404.1545, and 416.945; SSR 96-8p.   In making this assessment, the ALJ considers all of the Plaintiff's impairments, including any medically determinable non-severe impairment.   20 C.F.R. §§ 404.1545 (a)(2), and 416.945(a)(2).

This disability determination involves shifting burdens of proof.   The initial burden rests with the claimant to demonstrate that she is unable to engage in past

---

abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers, and work pressures.  20 C.F.R. §§ 404.1545(c), and 416.945(c).

[19] If the Plaintiff has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled.  20 C.F.R. §§ 404.1520(d), and 416.920(d).  If the Plaintiff does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation proceeds to the next step.  20 C.F.R. §§ 404.1520(e), and 416.920(e).

[20] If the Plaintiff has the residual functional capacity to do her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(f), and 416.920(f).

relevant work.   If the Plaintiff satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.   20 C.F.R. §§ 404.1520(g), 404.1566-69, 416.920(g), and 416.966-69; *see also Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993).

The ALJ's disability determination must also meet certain basic procedural and substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests."   *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).   Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence.   *Id.* at 706-707.   In addition, "[t]he ALJ must indicate in [her] decision which evidence [she] has rejected and which [she] is relying on as the basis for [her] finding." *Schaudeck v. Comm. of Soc. Sec.*, 181 F. 3d 429, 433 (3d Cir. 1999).

### 2.   Guidelines for Assessing the Severity of Impairments at Step Two of the Sequential Evaluation Process

At step two of the sequential evaluation process, the ALJ considers whether the Plaintiff's impairment is (1) medically determinable or non-medically

determinable, and (2) severe or non-severe; this step is essentially a threshold test. 20 C.F.R. §§ 404.1520, 416.1520. The Third Circuit has observed that "[t]he burden placed on an applicant at step two is not an exacting one." *McCrea v. Comm. of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). Moreover, any doubt as to whether a Plaintiff has made a sufficient showing of severity at step two should be resolved in favor of the applicant. *Id.*

The evaluation of a mental impairment at step two of the sequential evaluation process requires the ALJ to evaluate the alleged impairment or impairments under listing 12.00 of the listing of impairments. Listing 12.00 requires consideration of "A" "B" and sometimes "C" criteria.[21] Social Security Ruling (SSR) 96-8p cautions that "the adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph 'C' criteria are not an RFC assessment" and are instead, broad categories "used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential process." SSR 96-8p. "The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in broad categories found in paragraphs B and C of the adult mental

---

[21] Paragraph B criteria refer to the ALJ's assessment of the four major functional areas of: activities of daily living; social functioning; maintaining concentration, persistence, or pace; and repeated episodes of decompensation, each of extended duration. *See* 20 C.F.R., part 404, subpart P, appendix 1, 12.00.

disorders, listing 12.00 of the Listing of Impairments, and summarized on the PRTF." *Id.*

If a Plaintiff has no impairment or combination of impairments which significantly limits his physical or mental abilities to perform basic work activities, e.g., an impairment that is both medically determinable and severe, the claimant will be found "not disabled" and the evaluation process ends at step two. *Id.* If, however, the Plaintiff has *any* medically determinable impairment that is severe, the evaluation process continues. *Id.* Furthermore,

> [E]ven if an ALJ erroneously determines at step two that one impairment is not "severe," the ALJ's ultimate decision may still be based on substantial evidence if the ALJ considered the effects of that impairment at steps three through five. However, where it appears that the ALJ's error at step two also influenced the ALJ's RFC analysis, the reviewing court may remand the matter to the Commissioner for further consideration. *See Nosse v. Astrue*, No. 08-[CV-1173, 2009 WL 2986612, *10] (W.D.Pa. Sept. 17, 2009).

*McClease v. Comm. of Soc. Sec.*, No. 8-CV-1673, 2009 WL 3497775, *10 (E.D.Pa. Oct. 28, 2009); *see also Salles v. Comm. of Soc. Sec.*, 229 F.Appx. 140, 145, n.2 (3d Cir. 2007)(*citing Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005)("Because the ALJ found in Salles's favor at Step Two, even if he had erroneously concluded that some of her impairments were non-severe, any error was harmless.").

### 3. Legal Benchmarks for Assessing Treating Physician Opinions

It is beyond dispute that, in a social security disability case, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." *Cotter*, 642 F.2d at 704. This principle applies with particular force to the testimony of a treating physician, testimony that is to be accorded great weight by the ALJ. In this regard, the legal standards governing our evaluation of this type of evidence are familiar ones. In *Morales v. Apfel*, 225 F.3d 310 (3d Cir. 2000), the Court of Appeals for the Third Circuit set forth the standard for evaluating the opinion of a physician stating that:

> A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Plummer [v. Apfel*, 186 F.3d 422, 429 (3d Cir.1999)] (*quoting Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir.1987)); *see also Adorno v. Shalala*, 40 F.3d 43, 47 (3d Cir.1994); *Jones*, 954 F.2d at 128; *Allen v. Bowen*, 881 F.2d 37, 40-41 (3d Cir.1989); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir.1988); *Brewster*, 786 F.2d at 585. Where, as here, the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." *Plummer*, 186 F.3d at 429 (*citing Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir.1993)). The ALJ must consider the medical findings that support a treating physician's opinion that the claimant is disabled. *See Adorno*, 40 F.3d at 48. In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his or her own credibility judgments, speculation or lay opinion. *Plummer*, 186 F.3d at 429;

> *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir.1988); *Kent*, 710
> F.2d at 115.

*Id.* at 317-318.

Furthermore, when assessing competing views of treating and non-treating physicians, the ALJ and this court are cautioned that:

> [A]n ALJ is not free to employ her own expertise against that of a
> physician who presents competent medical evidence. *Ferguson*,765
> F.2d at 37 (1985). When a conflict in the evidence exists, the ALJ
> may choose whom to credit but "cannot reject evidence for no reason
> or for the wrong reason." *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d
> Cir.1993). The ALJ must consider all the evidence and give some
> reason for discounting the evidence she rejects. *See Stewart v.
> Secretary of H.E.W.*, 714 F.2d 287, 290 (3d Cir.1983).Treating
> physicians' reports should be accorded great weight, especially "when
> their opinions reflect expert judgment based on a continuing
> observation of the patient's condition over a prolonged period of
> time." *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir.1987); 20
> C.F.R. § 404.1527(d)(2) (providing for controlling weight where
> treating physician opinion is well-supported by medical evidence and
> not inconsistent with other substantial evidence in the record.) An
> ALJ may reject a treating physician's opinion outright only on the
> basis of contradictory medical evidence, but may afford a treating
> physician's opinion more or less weight depending upon the extent to
> which supporting explanations are provided. *Newhouse v. Heckler*,
> 753 F.2d 283, 286 (3d Cir.1985).

*Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir.1999).

Similarly, the Social Security Regulations state that when the opinion of a treating physician is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record," it is to be given controlling weight. 20 C.F.R. §§

404.1527(c)(2), and 416.927(c)(2).  When the opinion of a physician is not given

controlling weight, the length of the treatment relationship and the frequency of

examination must be considered.  The Regulations state:

> Generally, the longer a treating source has treated you and the more
> times you have been seen by a treating source, the more weight we
> will give to the source's medical opinion. When the treating source has
> seen you a number of times and long enough to have obtained a
> longitudinal picture of your impairment, we will give the source's
> opinion more weight than we would give it if it were from a non-
> treating source.

20 C.F.R.  §§ 404.1527(c)(2)(i), and 416.927(c)(2)(i).

Additionally, the nature and extent of the doctor-patient relationship is

considered. The Regulations state:

> Generally, the more knowledge a treating source has about your
> impairment(s) the more weight we will give to the source's medical
> opinion. We will look at the treatment the source has provided and at
> the kinds and extent of examinations and testing the source has
> performed or ordered from specialists and independent laboratories.
> For example, if your ophthalmologist notices that you have
> complained of neck pain during your eye examinations, we will
> consider his or her opinion with respect to your neck pain, but we will
> give it less weight than that of another physician who has treated you
> for the neck pain. When the treating source has reasonable knowledge
> of your impairment(s), we will give the source's opinion more weight
> than we would give it if it were from a nontreating source.

20 C.F.R.  §§ 404.1527(c)(2)(ii), and 416.927(c)(2)(ii).  Non-controlling medical

opinions by treating sources are also accorded more or less weight based on the

extent to which the medical source presents relevant evidence in support of the

opinion, and based upon the extent to which it is consistent with the record as a whole.  20 C.F.R. §§ 404.1527(c)(3)-(4), and 416.927(c)(3)-(4).

Given this recognition of the great weight that should attach to the professional judgment of treating physicians, it is axiomatic that an ALJ must provide an adequate explanation for any decision which chooses to disregard a treating physician's findings regarding illness, impairment and disability. Moreover, when an ALJ fails to adequately explain why a treating physician's medical assessment has been discounted, a remand for further development of the factual record is proper. *See e.g., Burnett*, 220 F.3d at 119 (failure to adequately discuss competing medical evidence compels remand of ALJ decision); *Schaudeck*, 181 F.3d at 433; *Allen v. Bowen*, 881 F.2d 37, 40-41 (3d Cir. 1989); *Belotserkovskaya v. Barnhart*, 342 F.Supp.2d 335, 338 (E.D. Pa. 2004). Thus, as one court has aptly observed:

> "An ALJ may not reject a physician's findings unless he first weighs them against other relevant evidence and explains why certain evidence has been accepted and why other evidence has been rejected." *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir.1993) (internal quotation marks, citations and indication of alteration omitted). Where the findings are those of a treating physician, the Third Circuit has "long accepted" the proposition that those findings "must [be] give[n] greater weight ... than ... the findings of a physician who has examined the claimant only once or not at all." Id. (citations omitted) An ALJ may reject a treating physician's opinion on the basis of contradictory medical evidence, *see Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir.1988), and may afford a medical opinion more or less weight depending upon the extent to which supporting explanations are provided, *see Mason*, 994 F.2d at 1065 ("[f]orm

> reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best"), and whether the reporting doctor is a specialist, *see Id.* at 1067. An ALJ may not, however, reject medical determinations by substituting [her] own medical judgments. *See Frankenfield*, 861 F.2d at 408.

*Terwilliger v. Chater*, 945 F.Supp. 836, 842-3 (E.D.Pa.1996).

### 4.    Guidelines for Assessment of Subjective Complaints

Moreover, where a disability determination turns on an assessment of the level of a claimant's pain, the Social Security Regulations provide a framework under which a claimant's subjective complaints are to be considered.  20 C.F.R. §§ 404.1529, and 416.929.  Such cases require the ALJ to "evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work." *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999). Cases involving an assessment of a Plaintiff's subjective reports of symptoms "obviously require[ ]" the ALJ "to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it." *Id.*

In making this assessment, the ALJ is guided both by statute and by regulations. This guidance eschews wholly subjective assessments of a claimant's pain.  The ALJ is admonished that an "individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically

acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all the evidence . . . , would lead to a conclusion that the individual is under a disability." 42 U.S.C. § 423(d)(5)(A).

Applying this statutory guidance, the Social Security Regulations provide a framework under which a claimant's subjective complaints are to be considered. 20 C.F.R. §§ 404.1529, and 416.929. Under these regulations, first, symptoms, such as pain, shortness of breath, and fatigue, will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings.  20 C.F.R. §§ 404.1529(b), and 416.929(b). Once a medically determinable impairment which results in such symptoms is found to exist, the Commissioner must evaluate the intensity and persistence of such symptoms to determine their impact on the claimant's ability to work. *Id*.  In so doing, the medical evidence of record is considered along with the claimant's statements. *Id.* SSR 96-7p gives the following instructions in evaluating the credibility of the claimant's statements regarding her symptoms:

> In general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining

whether the individual is disabled depends on the credibility of the statements. In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true. When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.

SSR 96-7p. Additionally, SSR 96-4p provides that:

Once the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the pain or other symptoms alleged has been established on the basis of medical signs and laboratory findings, allegations about the intensity and persistence of the symptoms must be considered with the objective medical abnormalities, and all other evidence in the case record, in evaluating the functionally limiting effects of the impairment(s).

SSR 96-4p.

### 5.   Judicial Review of ALJ Determinations–Standard of Review

Once the ALJ has made a disability determination, it is then the responsibility of this court to independently review that finding. In undertaking this task, this court applies a specific, well-settled and carefully articulated standard of review. Congress has specifically provided that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).

The "substantial evidence" standard of review prescribed by statute is a deferential standard of review. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir.

2004). When reviewing the denial of disability benefits, we must simply determine whether the denial is supported by substantial evidence. *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988); *see also Johnson v. Comm. of Soc. Sec.,* 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Johnson*, 529 F.3d at 200 (*quoting Hartranft*, 181 F.3d at 360); *see also Pierce v. Underwood*, 487 U.S. 552 (1988). It is less than a preponderance of the evidence but more than a mere scintilla of proof. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Plummer*, 186 F.3d at 427 (*quoting Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995).

A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason*, 994 F.2d at 1064. However, in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the decision] from being supported by substantial evidence." *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620 (1966). Furthermore, in determining if the ALJ's decision is supported by substantial evidence the court

may not parse the record but rather must scrutinize the record as a whole. *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981).

### B.     Disability Evaluation Process

With respect to the Plaintiff's Title II application for DIB, the ALJ proceeded through steps one through four of the five step sequential evaluation process. The ALJ found, with respect to the Title II application for DIB, the Plaintiff met the insured status requirement under the Act through September 30, 1999. *Tr.* 529. In her assessment of the Plaintiff's Title XVI application for SSI, the ALJ proceeded through steps one through five of the sequential evaluation process. The ALJ concluded that the Plaintiff was not under a disability as defined by the Act at any time from August 18, 1996, her alleged onset date, through February 3, 2010, the date of the decision. *Tr.* 547-48.[22]

At step one of her analysis, the ALJ found the Plaintiff did not engage in any substantial gainful activity between August 18, 1996, and February 3, 2010. *Tr.* 530.

At step two of her analysis, the ALJ found that the Plaintiff had the severe impairments of: degenerative disc disease of the lumbar spine; right knee internal

---

[22] In order to eligible to receive DIB under Title II, an individual must be both "disabled" and "insured," that is, the individual has worked long enough and paid social security taxes. SSI is a need-based program, and benefits may not be paid for "any period that precedes the first month following the date all conditions for eligibility are met. *See* 20 C.F.R. §§ 416.501. Insured status is irrelevant in determining an individual's eligibility for SSI.

derangement with status post arthroscopic surgery; and, obesity. *Tr.* 530. The ALJ found that the Plaintiff had medically determinable non-severe impairments of: diabetes, asthma, hypertension, IBS, varicose veins, gastritis, and any alleged mental impairment. *Tr.* 535-37.

At step three of her analysis, the ALJ found the Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Tr.* 537.

Prior to beginning step four, the ALJ assessed that the Plaintiff had the RFC to perform less than a full range of light work[23] with the following additional limitations:

> The claimant is able to lift/carry 20 pounds occasionally and 10 pounds frequently; she can sit 6 out of eight hours, stand/walk 6 hours out of 8 hours with the option to sit or stand as needed and can sit up to one hour at a time and stand up to one hour at a time and can walk 10 blocks. She should avoid climbing, can push/pull to 20 pounds. She can occasionally balance, stoop, kneel and crawl. She has no manipulative visual or communicative limitations.

*Tr.* 537.

---

[23] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighting up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling or arm or leg controls. To be considered capable of performing a full or wide range of light work, an individual must have the ability to do substantially all of these activities. If someone can do light work, he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time. *See* 20 C.F.R. §§ 404.1567(b), and 416.967(b).

At step four of her analysis, the ALJ found that, during the period relevant to her Title II claim for DIB, from August 18, 1996, to September 30, 1999, the Plaintiff was able to perform her past relevant work as a sales person and receptionist; thus the ALJ ended her analysis of the Plaintiff's Title II application at step four of the sequential evaluation process. *Tr.* 545-46. With respect to the Plaintiff's Title XVI claim for SSI, however, the ALJ found that the Plaintiff had no past relevant work within the fifteen years prior to the ALJ's decision dated February 3, 2010. *Id.*

At step five of her analysis of the Plaintiff's Title XVI claim, the ALJ found that, considering the Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that the Plaintiff could perform. *Tr.* 547. At the Plaintiff's January 5, 2010, hearing the VE identified three representative positions that could be performed by the Plaintiff: small products assembler, DOT 706.684-022, a light, unskilled occupation with 2,541 positions regionally and 513,000 positions nationally; mail clerk, DOT 209.687-026, a light, unskilled occupation with 1,120 positions regionally and 2.9 million positions nationally; and, counter clerk, DOT 249.366-010, a light, unskilled occupation with 930 positions regionally and 93,500 positions nationally. *Tr.* 1012-1013.

### C.    The ALJ's Decision Lacks Adequate Explanation to Permit Judicial Review

In determining whether there is substantial evidence to support an ALJ's decision, this court owes deference to her evaluation of the evidence, credibility assessment, and reconciliation of conflicting expert opinions.  There are, however, cases where the court cannot reasonably ascertain whether the ALJ gave ample consideration to the competing evidence, and whether a Plaintiff's conditions, either individually or collectively, preclude the performance of substantial gainful activity; this is one such case.  Accordingly, for the reasons that follow, I find that, the ALJ's decision lacks sufficient explanation to permit review by this court.

One of the most troublesome aspects of this case is the ALJ's treatment of the evidence relating to the Plaintiff's mental impairments.  Here, at step two the ALJ found that the Plaintiff's alleged mental impairment was non-severe, but found, without any explanation, that the Plaintiff had "no more than mild" limitations in social functioning, and maintaining concentration, persistence, and pace.[24]  As discussed above, to permit judicial review, an ALJ's decision must be accompanied a clear explanation of the basis on which it rests.  *Cotter*, 642 F.2d at 704.  Further, the ALJ must identify the evidence she relies on as the basis for her

_____

[24] The ALJ's step two analysis in this case was addressed partially out of sequence. The ALJ found that the Plaintiff's mental impairment was medically determinable but non-severe at step two.  She analyzed the impairment under section 12.00 of the medical listings during her RFC assessment after step three of the sequential evaluation process.

finding. *Schaudeck*, 181 F.3d at 433.  The ALJ failed to provide an explanation of the evidence she relied on in her analysis of the "B criteria."

Further, the Plaintiff urges, and I agree, that the ALJ's ruling did not adequately explain the cumulative impact of the Plaintiff's obesity as it related to her ability to function in the workplace.  During the relevant period the Plaintiff, who is 5 feet 3 inches tall, weighed between 170 and 400 pounds.  At step two of the sequential evaluation process, the ALJ found the Plaintiff's obesity was a severe impairment.  Impairment due to obesity must be analyzed in terms of its cumulative impact on a Plaintiff's functional abilities.  SSR 02-1p (recognizing that obesity often complicates chronic diseases of the cardiovascular, respiratory, and musculoskeletal body systems, and may increase the severity of such conditions). In her decision, the ALJ stated that:

> With regard to the claimant's obesity, no physician has reported a correlation between her weight and the functional impact it has on her condition, especially her knee impairment.  The only physician that makes reference to weight loss is Dr. Bernstein, who stated that at the time of her accident the claimant reported her weight was 340 pounds, but weighed 180 pounds when he examined her in 1998.  He also indicated that at the time of the claimant's August 23, 2000 visit that she should lose weight, though how much she weighed is not mentioned.  Dr. Seo reports her weight at 194 pounds.  Subsequent treatment records not that her weight had increased to 300 pounds, but results on physical examination did not change.  However, at the hearing she stated that she has lost 100 pounds.  I have taken into consideration the claimant's obesity in deciding her residual functional capacity.

*Tr.* 540.   As the Plaintiff points out, however, the ALJ's discussion of her impairment due to obesity is somewhat disorganized.   At the hearing, the Plaintiff did indeed testify that she weighed 340 pounds in August 1996, she then reported that she lost over 100 pounds, but the ALJ failed to recognize that this weight loss occurred ten years prior to the most recent decision.   The Plaintiff's medical records reflect that her 100 pound weight loss was followed by a period of substantial weight gain.   The last reported weight in her medical treatment records is 324 pounds on October 13, 2008.   *Tr.* 948.   At the hearing in 2010, the Plaintiff testified that she weighed 398 pounds; no medical records were provided to substantiate her testimony.   *Tr.* 970.   Furthermore, the ALJ recognized that she took the Plaintiff's obesity into consideration, but did not provide any meaningful explanation as to the degree her obesity exacerbated her knee and back injuries, and whether it impacted her ability function in the workplace.   *See Diaz v. Comm. of Soc. Sec.*, 557 F.3d 500, 504 (3d Cir. 2009)(finding that morbid obesity would seem to have some exacerbating effect on a joint dysfunction as a matter of common sense, if not medical diagnosis).

On remand, the ALJ should re-evaluate the Plaintiff's alleged mental impairment, and it's severity, in addition to her impairment due to obesity, together and with her other physical impairments, including her knee and back injuries.

## IV.   RECOMMENDATION

Accordingly, for the foregoing reasons, IT IS RECOMMENDED that the decision of the Commissioner be VACATED, and this case be REMANDED for further review consistent with the above findings.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified  proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 26th day of March 2014.

*S/Susan E.  Schwab*
Susan E. Schwab
United States Magistrate Judge